UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGELA NORCIA,

                              Plaintiff,                    Case No. 10-CV-4959 (KMK)

        -v-                                                 OPINION AND ORDER

DIEBER'S CASTLE TAVERN, LTD. et al.,

                              Defendants.

Appearances:

Thomas Peter Giuffra, Esq.
Rheingold, Valet, Rheingold, McCartney & Giuffra, LLP
New York, NY
*Counsel for Plaintiff*

KENNETH M. KARAS, District Judge:

        In this "dram shop" personal-injury action, Plaintiff Angela Norcia ("Norcia") seeks to

recover damages for injuries she sustained when a speedboat operated by Frank J. Dieber, Jr.

("Dieber, Jr.") collided with the cruiser on which she was a passenger.  Plaintiff seeks to recover

damages from owners and operators of the bars that served Dieber, Jr. alcohol in the hours

leading up to the accident ("Defendants").  As the Court previously granted a default against

Defendants, the only remaining task is to determine the amount of damages to which Plaintiff is

entitled.

I.  Background

A.  Factual Background

The following facts are based on Plaintiff's Complaint, the testimony that Plaintiff and her mother, Ms. Patricia Duffy Vreeland ("Vreeland"), gave at an Inquest Hearing that the Court held on September 13, 2013, and the exhibits received at that hearing.  Because Defendants defaulted, no facts have been proffered on their behalf, and the Court accepts Plaintiff's well-pleaded allegations as true.  *See Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) ("[I]t is well established that . . . a party's default is deemed to constitute a concession of all well pleaded allegations of liability . . . ." (internal quotation marks omitted)).

During the relevant time period, Defendants owned and operated a bar located at 13 Castle Court in Sterling Forest, Orange County, New York, known alternatively as "Dieber's Breezy Point," "The Castle Tavern & Marina," or "The Castle Tavern."  (*See* Compl. ¶¶ 10–68.) On or about June 29–30, 2007, the bar served Dieber, Jr. alcohol in excessive amounts, continued to do so even after he was visibly intoxicated, and then permitted him to leave the premises.  (*See id*. ¶¶ 69–74.)  After leaving the bar, Dieber, Jr. boarded and operated a twenty-foot Formula SR1 speedboat on Greenwood Lake, also located in Orange County.  (*See id*. ¶ 75.) Early in the morning on June 30, 2007, Dieber, Jr. was speeding and operating the speedboat in a reckless and dangerous manner when he violently collided with the anchored and floating twenty-foot Riviera pontoon-style cruiser vessel on which Plaintiff was a passenger.  (*See id*. ¶ 78–79.)

2

According to Plaintiff, "[t]he pontoon boat was completely destroyed, split almost down the middle on top." (Inquest Hr'g Tr. 13.)  The speedboat that Dieber, Jr. was driving had gone "completely over [Plaintiff's] arms." (*Id.* at 14.)  At the Inquest Hearing, Plaintiff described what happened to her as a result of the collision: "[A]ll of a sudden, I realized that . . . I was starting to taste blood and . . . my arm started to burn . . . I was just in very intense pain, and I couldn't get up." (*Id.*)

After the collision, Plaintiff was medically evacuated via helicopter from the scene of the accident to Westchester Medical Center. (*Id.* at 15.)  Ms. Vreeland, who is an emergency-room nurse, first saw Plaintiff in her injured state in the hospital waiting room. (*See id.* at 53–54.)  Ms. Vreeland described both of Plaintiff's arms as "outstretched" and "bloody through the covers." (*Id.* at 54.)  She observed that Plaintiff's arm and hand were nearly perpendicular to one another, and that she could "see bones outside the flesh." (*Id.* at 54, 56.)  She also saw hospital staff "trying to pull the arm out and bring the bones back in and reattach." (*Id.* at 56.)[1]

Plaintiff subsequently underwent seven surgeries during the two-and-a-half weeks that she remained at the hospital. (*See id*. at 18–19, 22.)  Her doctors attached an external fixator, and "replaced a lot of [her] bones . . . with pins and rods." (*Id.* at 17–18, 21, 58.)  They explained to her that her "bones were almost like Rice [K]rispies.  They were shattered and broken and . . . sticking out." (*Id*. at 22.)

---

[1] On this point, Ms. Vreeland's testimony was quite dramatic:
"When you have that kind of fracture, a compound fracture, it means the bones have punctured through the skin.  You can see the bone sticking out . . . .  And in [Plaintiff's] case, on both arms, the bones were protruding through the skin, but in particular on the left because the hand was off to the side.  You could see the stump of bone, what was left there . . . .  It was shattered."
(*Id.* at 57.)

3

Plaintiff became aware of the extent of her injuries after her first surgery.  (*See id.* at 17.)
She described the magnitude of the pain she endured: "[I]t's something where . . . nothing can
stop it.  It's almost like . . . you want to rip your whole body apart because . . . it's so painful.  I
mean, I don't really know how to pinpoint it because it's just your whole entire body is just in a
state of something you never felt before."  (*Id*. at 18.)  Plaintiff was in so much pain that "at
points, [she] was inconsolable . . . . [She] was a complete mess."  (*Id*.)  She would sometimes
wake up in the morning and "be screaming in pain because . . . [the] medication [had worn] off,
and there was nothing [that she] could do . . . ."  (*Id*. at 23.)  "[E]motionally, [she] was
completely all over the place . . . angry one minute, crying the next minute . . . ."  (*Id*.)

Ms. Vreeland described the challenges her daughter faced while hospitalized.  "Angela is
a young girl, and she was in there a long time and . . . things that young girls have to take care of,
personal things, she couldn't do . . . there [were] male technicians, male nurses.  It was very hard
for her.  And she had a number of breakdowns, some from pain.  One particular instance where
she was left in a bloody bathroom for hours without help because . . . she's a young girl and she
wouldn't let the male [attendant] in . . . ."  (*Id*. at 59.)

During the recovery period following her discharge from the hospital, Plaintiff's left arm
was cast in plaster, while her right arm was in a molded cast capable of being removed, but
wrapped underneath.  (*See id.* at 24.)  For months after returning home, she was unable to "take
care of [the] activities of daily living," such as brushing her hair, eating, and going to the
bathroom.  (*Id*.)  Her incapacity made her feel "[l]ike garbage.  Like 25 going on 6 . . . .  It was
not a very happy situation for [her]."  (*Id*. at 24–25.)  Plaintiff was unable to use the restroom or

bathe without assistance until September 2007, when the cast on her left arm was finally removed.  (*See id.* at 25.)

Plaintiff's injuries and the surgeries to repair them left her with substantial scars up and down both of her arms, which she displayed to the Court at the Inquest Hearing.  (*See id.* at 31.) Ms. Vreeland noted that when Plaintiff's cast was removed, "the sutures [were] black.  The scarring around it [was] black . . . .  And that's what she saw the first time.  And that's when she said that she didn't want to live anymore, when she became depressed."  (*Id*. at 60–61.)  "It was very hard for her . . . .  She was a 24-year-old with these . . . arms that looked to her like she was a monster."  (*Id*. at 62.)

After this period of home rest, Plaintiff began a "painful" physical-therapy regimen at Valley Hospital in Ridgewood, New Jersey, which she continued for three to six months.  (*Id.* at 25–26.)  Plaintiff's hand "was stuck at a 90 degree angle," so the physical therapists "spent a lot of time stretching [Plaintiff's] arm and trying to get [her] to function, because there was so much nerve damage and [her] fingers didn't work."  (*Id*. at 25; Inquest Hr'g Ex. A.)  In February 2008, she was required to undergo additional surgery, to remove a screw that had broken through the skin on her arm.  (Inquest Hr'g Tr. 26.)

At some point, Plaintiff also began psychological treatment in a group-therapy program, before switching to a private psychiatrist.  (*See id.* at 27.)  Plaintiff sought mental-health treatment after a visit to one of her doctors, who informed her in front of the rest of the waiting room that he could not continue to provide her with free casting supplies, as she was uninsured. (*See id*.)  "So [Plaintiff] wound up basically having a breakdown and pretty much wanted to kill [herself] . . . .  [She] was admitted to Valley Hospital that day to get a psychiatric evaluation.

5

And they wanted to commit [her] to a psychiatric hospital . . . [but] [she] refused because, unfortunately, it was [her] choice at the time . . . ." (*Id*.)

Plaintiff also lost many of her friends. As Plaintiff explained: "[U]nfortunately, I knew the person that ran me over. And we were all in a group of friends. And it completely divided our community . . . . [P]eople took sides . . . . [T]hey blamed us [for the accident] . . . . So I got a lot of ridicule . . . ." (*Id*. at 28.) During this time, Plaintiff's physical pain continued. (*Id*. at 29.)

When Plaintiff began seeing a psychiatrist, he attempted to address her sleeping issues and nightmares by prescribing sleep medication and talking through what had happened. (*See id*.) Although her visits to the psychiatrist helped "in some aspects," Plaintiff eventually stopped going, because "it was expensive," and she had no insurance and was unemployed, and her mother was paying "a hundred dollars a session" for Plaintiff to go there weekly. (*Id*. at 30.)

Based on her injuries, Plaintiff was eligible to receive disability. (*See id*. at 34.) But in an extraordinary display of resolve, she refused to accept a disability determination, and instead rejoined the workforce. (*See id.* at 34–35.) As Plaintiff forcefully described, she "couldn't sit at home for the rest of [her] life and not work and live by minimal means," saying that to do so would have been "just impossible." (*Id*. at 34.)

Plaintiff currently works as a flight attendant for a major airline, a position that she has held for three-and-a-half years. (*Id.* at 34–35.) At the Inquest Hearing, Plaintiff and Ms. Vreeland described in detail the significant professional challenges that Plaintiff has had to overcome because of her injuries. (*Id*. at 34–35, 63.) For example, Plaintiff testified that sometimes when she gets home from work she is "in so much pain that . . . [her] mom gets a text

message at 1:00 in the morning, when [she has] gotten back from a flight," saying that her arms "are burning." (*Id.* at 35–36.)  Ms. Vreeland testified that Plaintiff has experienced "a lot more pain." (*Id.* at 63.)

Plaintiff has recently sought additional medical treatment and advice in response to the difficulties she faces at work.  After she fell and broke her hand in December 2011, the attending orthopedic surgeon told her that she "really need[s] to reevaluate [her] life because there's no reason [her] hand should have broken from that fall . . . ." (*Id.* at 36.)  A second doctor told her the same thing, saying that if Plaintiff "keep[s] doing what [she is] doing," she is "going to damage [herself] so bad that [she is] not going to be able to do anything." (*Id.* at 37.)

Plaintiff still has not given up working, "[b]ecause [she] do[es]n't know what else to do." (*Id.* at 38.)  Plaintiff, a high school graduate, was earning approximately $30,000 per year as a bartender at Jessie's Country Kettle in Hewitt, New Jersey at the time of the accident.  (*See id.* at 38–39.)  Currently, her flight-attendant wages are being garnished to repay her medical expenses, in the amount of ten percent per paycheck, and have been for a year and a half.  (*See id*. at 33.)

There are many things in her everyday life that Plaintiff is no longer able to do because of her injuries.  For example, she cannot pick up her nephews, open jars, or collect change at toll booths.  (*Id.* at 39–40.)  She "used to work out all the time," but now she cannot do push-ups or pull-ups, rock climb, or play volleyball.  (*Id.* at 40.)  She "just had to relearn how to do a bunch of stuff," and "some stuff, [she] just can't do." (*Id.*)  Plaintiff now does "[p]retty much everything" with difficulty.  (*Id.*)

B.  Procedural History

Plaintiff filed her Complaint on June 25, 2010.  (Dkt. No. 1.)  On February 27, 2012, after Defendants failed to appear, this Court granted Plaintiff's application for a partial default against Defendants in an amount to be determined at trial or inquest.  (Dkt. No. 18.)  Following a status conference on July 10, 2013, the Court directed Plaintiff to submit documentation in support of her damages claim no later than July 26, 2013.  (Dkt. No. 29.)  Plaintiff's counsel requested an extension of that deadline to August 16, 2013, which request the Court granted. (Dkt. No. 30.)

Following the Court's receipt of Plaintiff's Inquest Memorandum and attached exhibits on August 15, 2013, the Court held an Inquest Hearing on September 13, 2013, during which Plaintiff and Ms. Vreeland testified, and during which Plaintiff offered a number of exhibits. (Dkt. No. 31–32.)  At the Court's request, Plaintiff submitted a Post-Inquest Memorandum on September 20, 2013.  (Dkt. No. 33.)

Plaintiff seeks $10,000,000 in present injuries, medical expenses, loss of earnings, impairment of future earning ability, and future pain and suffering, as well as $20,000,000 in punitive damages, and $978.58 in costs and disbursements.  (Inquest Mem. ¶¶ 34, 35, 39.) Plaintiff cites violations of New York State's Dram Shop Acts, New York State General Obligations Law §§ 1-100 and 11-101, and New York State Alcoholic Beverage Control Law § 65(2) as statutory bases for damages.  (*Id.* ¶¶ 23–24.)

## II.  Discussion

### A.  Damages-Assessment Standard

Upon entry of a default judgment, the Court "accept[s] as true all of the factual allegations of the complaint, except those relating to damages." *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *see also Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (same); *Clark v. Gotham Lasik, PLLC*, No. 11-CV-1307, 2013 WL 4437220, at *3 (S.D.N.Y. Aug. 20, 2013) (same).  Unless damages are certain, they must be proven in a post-default inquest where the defendant has an opportunity to contest the plaintiff's claims.  *See Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974); *see also Parris v. Pappas*, 844 F. Supp. 2d 271, 274 (D. Conn. 2012).  The burden is on the plaintiff to establish entitlement to the recovery of damages.  *See State Auto Prop. & Cas. Ins. Co. v. Shats*, No. 11-CV-220, 2013 WL 1736794, at *3 (E.D.N.Y. Mar. 28, 2013).

Calculating the appropriate amount of damages is a two-step process: (1) "determining the proper rule for calculating damages on . . . a claim"; and (2) "assessing plaintiff's evidence supporting the damages to be determined under this rule." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999); *see also Braccia v. D'Blass Corp.*, No. 08-CV-8927, 2011 WL 2848146, at *3 (S.D.N.Y. June 13, 2011) (same), *adopted by* 2011 WL 2848202 (S.D.N.Y. July 18, 2011); Fed. R. Civ. P. 55(a) (same).  Damages must be established "with reasonable certainty," *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997), and based only on admissible evidence, *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010); *Braccia*, 2011 WL 2848146, at *3; *Cesario v. BNI Constr., Inc.*, No. 07-CV-8545, 2008 WL 5210209, at *2

(S.D.N.Y. Dec. 15, 2008), *adopted by* 2009 WL 424136 (S.D.N.Y. Feb. 19, 2009).

   "The assessment of damages following entry of a default judgment in a diversity action is governed by state law standards." *Hinckley v. Westchester Rubbish, Inc.*, No. 04-CV-0189, 2006 WL 2849841, at *4 (S.D.N.Y. Oct. 2, 2006) (citing *Consorti v. Armstrong World Indus., Inc.*, 103 F.3d 2, 4 (2d Cir. 1995)). "Under New York law . . . courts look to approved awards in similar cases as guideposts in fashioning appropriate damage awards." *Id.*; *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 425 (1996) ("To determine whether an award 'deviates materially from what would be reasonable compensation,' New York state courts look to awards approved in similar cases." (quoting N.Y. C.P.L.R. § 5501(c))).

   "Actual damages, also termed compensatory damages, are allowed to be recovered in an action pursuant to the New York Dram Shop Act . . . ." *Braccia*, 2011 WL 2848146, at *4 (citation omitted) (citing N.Y. Gen. Oblig. Law § 11-101). "'Generally, under New York law a plaintiff may recover his [or her] loss of earnings, medical expenses, and mental and physical pain and suffering.'" *Id.* (quoting *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1082 (2d Cir. 1988)). Additionally, the New York Dram Shop Act "clearly contemplates the imposition of punitive damages," *Yeerang Jang v. Miksad*, No. 09-CV-9554, 2012 WL 834275, at *6 (S.D.N.Y. Feb. 17, 2012), *decision clarified on reconsideration sub nom. Jang v. Miksad*, 2012 WL 1332731 (S.D.N.Y. Apr. 9, 2012), as it provides that "[a]ny person who shall be injured in person, property, means of support, or otherwise by any intoxicated person . . . shall have a right to recover actual and exemplary damages." N.Y. Gen. Oblig. Law § 11-101(1). In the context of the New York Dram Shop Act, "exemplary" means the same thing as "punitive." *See Rutledge v. Rockwells of Bedford, Inc.*, 613 N.Y.S.2d 179, 180 (App. Div. 1994).

B.  Admissibility of Evidence

The Court bases its damages determination on the testimony that Plaintiff and Ms. Vreeland gave at the Inquest Hearing, as well as the exhibits introduced therein, which consist of various medical reports and bills related to Plaintiff's injuries and treatment.  These information sources are admissible evidence upon which the Court is entitled to rely.

As to Plaintiff's and Ms. Vreeland's testimony, it is beyond doubt that the Court may rely upon such sworn statements in reaching a damages determination.  *See Scott v. John Doe Corp.*, No. 01-CV-5910, 2006 WL 2335542, at *2–3 (E.D.N.Y. Aug. 10, 2006) (relying on plaintiffs' damages-inquest-hearing testimony in reaching damages determination for past pain and suffering and loss of services and anguish in personal-injury action); *Villalba v. Rockford Sys., Inc.*, No. 02-CV-4455, 2006 WL 526660, at *4–5 (E.D.N.Y. Mar. 3, 2006) (relying on plaintiff's damages-inquest-hearing testimony in reaching damages determination for past and future pain and suffering, lost wages and future earnings, and past and future medical expenses in personal-injury default action).  Here, the Court finds that Plaintiff's and Ms. Vreeland's testimony was entirely credible.

As to the medical records, they "can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated."  *Hodges v. Keane*, 886 F. Supp. 352, 356 (S.D.N.Y. 1995) (citing *Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993)). Properly authenticated "[s]tatement[s] that . . . [are] made for —and [are] reasonably pertinent to —medical diagnosis or treatment; and . . . describe[] medical history; past or present symptoms or sensations; their inception; or their general cause" are also admissible under Federal Rule of

11

Evidence 803(4).  Fed. R. Evid. 803(4); *see also In re Fosamax Prods. Liab. Litig.*, 06-MD-1789, 2013 WL 174416, at *3 (S.D.N.Y. Jan. 15, 2013) ("Plaintiff must demonstrate that the statement she seeks to admit was pertinent to a medical diagnosis [for the statement to fall within Rule 803(4)'s hearsay exception].") (emphasis removed).

Here, Plaintiff properly authenticated the Westchester Medical Center as well as other medical records and bills during the Inquest Hearing, thus satisfying the authentication requirement.  (*See* Inquest Hr'g Tr. 32–33, 49–50; Inquest Hr'g Ex. A.)  The Court also finds that Plaintiff's medical records and bills from Westchester Medical Center were properly authenticated, because Plaintiff provided the Court with subpoenaed copies of them, accompanied by a certification signed by the Center's Medical Records Supervisors that "the attached writing, record or photograph is the full and complete record to date, of said condition, act, transaction, occurrence, or event," and that "[t]o the best of [her] knowledge, it was made in the regular course of business of this institution to make such records at the time of the condition, act, occurrence or event within a reasonable time thereafter."

C.  Medical Costs

Plaintiff is entitled to the medical expenses that she can establish with reasonable certainty.  *See Braccia*, 2011 WL 2848146, at *3–4.  Here, Plaintiff claims a total of $302,055.22 in past medical expenses.  (Inquest Mem. Ex. G.)  Plaintiff generally confirmed the claimed amount in her testimony.  (*See* Inquest Hr'g Tr. 32–33 ("Q.  Could you tell us how much in medical expenses did you become liable for as a result of this accident?  A.  About $300,000.").)

After reviewing the medical bills that Plaintiff submitted and authenticated at the Inquest

Hearing, the Court finds that Plaintiff is entitled to $300,331.22 in medical costs, $1,724 less

than what she claims.  The Court was able to verify only $1,344 of the $2,688 that she claims she

was billed by "Health Net America (COBRA/Pat's Ins.)," and only $80 of the $140 that she

claims she was billed by "Univ. Imaging & Med. Assoc., PC."  (*See* Inquest Mem. Ex. G.)  The

Court was also unable to verify any of the $320 that she claims she was billed by "WIMS, LLC."

(*Id.*)

### D.  Loss of Earnings

Plaintiff seeks compensation for loss of past and future earnings.  "The basic [New York]

rule is that loss of earnings must be established with reasonable certainty, focusing, in part, on

the plaintiff's earning capacity both before and after the accident."  *Clanton v. Agoglitta*, 615

N.Y.S.2d 68, 69 (App. Div. 1994); *see also Mergler v. CSX Transp., Inc.*, 875 N.Y.S.2d 735, 736

(App. Div. 2009) (same).

Loss of past earnings is established by calculating the income that the plaintiff lost

between the time of her injury and the determination of her damages.  *See* N.Y. Pattern Jury

Instructions–Civil, 2:290 (3d ed. 2013) ("[Plaintiff] is entitled to be reimbursed for any earnings

lost as a result of [her] injuries caused by [Defendant's] negligence from the time of the accident

to today . . . . [The] award must be calculated from the number of days that . . . [Plaintiff] was

disabled from working by the injuries and the amount that . . . [Plaintiff] would have earned had

[she] not been disabled."); *see also Sanchez v. City of New York*, 949 N.Y.S.2d 368, 374 (App.

Div. 2012) ("[W]e see no rational basis on which the jury could have completely deprived

plaintiff of her claim for past lost earnings. . . . [T]he record reflects that plaintiff is entitled to

13

something . . . for [loss of salary] between the accident and the trial."); *Molter v. Gaffney*, 710 N.Y.S.2d 654, 656 (App. Div. 2000) ("[T]he jury's award . . . for past lost wages for the . . . period between the date of the accident and the date of the trial was amply supported by the evidence.").

Damages for loss of past earnings may be awarded "based solely on plaintiff's testimony without supporting documentation."  *Kane v. Coundorous*, 783 N.Y.S.2d 530, 531 (App. Div. 2004); *see also Ferguson v. City of New York*, 901 N.Y.S.2d 609, 611 (App. Div. 2010) ("[P]roof of past lost earnings must be established with 'reasonable certainty' . . . . Such proof can consist [solely] of testimony . . . ."); *cf. Butts v. Braun*, 612 N.Y.S.2d 520, 521 (App. Div. 1994) (basing finding of "highest amount [of damages for loss of future earnings] that can be justified by plaintiff's evidence" on plaintiff's trial testimony).  However, establishing loss of future earnings is more complicated, and requires "comput[ing] . . . the monetary value of the diminution in the plaintiff's annual earning capacity, multiplying that amount by the number of years the plaintiff could have worked—[her] work-life expectancy—and then discounting that amount to the present value."  *Braccia*, 2011 WL 2848146, at *5 (internal quotation marks omitted).

Under New York Civil Practice Law and Rules § 4545, in "any action brought to recover damages for personal injury . . . where the plaintiff seeks to recover . . . loss of [past or future] earnings or other economic loss," "[i]f the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any . . . collateral source," it is required to "reduce the amount of the award by such finding . . . ."  N.Y. C.P.L.R. § 4545(a). The category of collateral sources that can potentially reduce a plaintiff's loss-of-earnings-

damages award includes disability payments.  *See French v. Schiavo*, 880 N.Y.S.2d 628, 629 (App. Div. 2009) ("[D]efendants carried their burden [at the collateral-source hearing] of demonstrating . . . that plaintiff's . . . past and future lost earnings were or would be replaced from [disability payments from Social Security and plaintiff's insurance company]."); *Terranova v. N.Y.C. Transit Auth.*, 850 N.Y.S.2d 123, 125 (App. Div. 2007) ("We . . . conclude . . . that the plaintiff's disability retirement pension is a collateral source within the meaning of [the statute] . . . .").  At the time of Plaintiff's accident, she was earning approximately $30,000 per year as a bartender.  (*See* Inquest Hr'g Tr. 39.)  Plaintiff's accident caused her to miss work for one year.  (*See id*.)  From the date of her accident to the date of the Inquest Hearing, Plaintiff has not received a penny in disability payments.  (*See id.* at 34, 61–62.)  In fact, the record shows that Plaintiff has decided not to complete her application for such benefits.  (*See id.* at 34–35, 61–62.)  Instead, Plaintiff sought and secured employment as a flight attendant with a major airline.  (*See id*. at 34–35.)

The Court was unable to find any case law suggesting that, where a plaintiff has not received any disability payments, but where the plaintiff might have been entitled to receive such payments had she applied for them, a court should reduce the plaintiff's loss-of-past-earnings-damages award by the amount of the payments that she would have received.  This lack of case law is unsurprising, for two reasons.  First, such a rule would be at odds with a plain reading of the statute, which requires a court to reduce a plaintiff's loss-of-past-earnings-damages award when that award "*was* . . . replaced or indemnified" by collateral-source payments.  N.Y. C.P.L.R. § 4545(a) (emphasis added).  A damages award that *could have been* replaced or indemnified, but *was not*, is of course not a damages award that *was* replaced or indemnified.

15

Second, such a rule would not give effect to the purpose of § 4545, which is to prevent double-damages recoveries. *See In re September 11 Litig.*, No. 21-MC-101, 2013 WL 3948342, at *6 (S.D.N.Y. Aug. 1, 2013) ("The purpose of Section 4545 is to eliminate double recoveries for the same loss. However, courts should not subtract non-duplicative payments, because doing so would produce results beyond those necessary to remedy the double recovery to plaintiffs at which the legislation was aimed . . . .") (alterations omitted) (citation omitted) (internal quotation marks omitted); *Fisher v. Qualico Contracting Corp.*, 779 N.E.2d 178, 180 (N.Y. 2002) ("The statutory objective [of § 4545] was to eliminate windfalls and double recoveries for the same loss.") (citing Governor's Program Memorandum, 1986 N.Y. Laws ch. 220, at 135–36; *Iazzetti v. City of New York*, 628 N.Y.S.2d 112, 113 (App. Div. 1995) ("The accident disability pension awarded to plaintiff . . . should be offset against his recovery for postverdict loss of earnings, otherwise he will benefit from precisely the kind of double recovery that the Legislature sought to eliminate."); *Oden v. Chemung Cnty. Indus. Dev. Agency*, 661 N.E.2d 142, 145 (N.Y. 1995) ("The chief criticism of the common-law rule [that Section 4545 supplanted] was that it permitted double recovery." (citations omitted)). A situation where a plaintiff's loss-of-earnings damages have not been replaced or indemnified, and where double recovery of those damages has thus not occurred, is not a situation to which the statute was designed to apply.

Therefore, the Court finds that Plaintiff is entitled to damages for loss of past earnings in the amount of $30,000, to compensate her for what she would have made had she been able to continue working as a bartender during the year in which her injuries kept her unemployed.[2] The

---

[2] Although the Court found Plaintiff's Inquest Hearing testimony that she earned $30,000 per year as a bartender to be credible, the Court also notes that a comparison of Plaintiff's claim to the annual mean wage for New Jersey's 15,000 or so bartenders lends Plaintiff's claim

amount of Plaintiff's past-earnings damages is not reduced by the amount of any disability payments to which Plaintiff would have been entitled during that time.  This is a just result; the cost of Plaintiff's decision to refrain from seeking disability payments while she was injured is thus borne not by the taxpayers, but by Defendants, whose culpability has already been conceded and established.

However, Plaintiff may not recover damages for future loss of earnings.  Plaintiff did not provide the Court with any information as to her current salary, either in the form of testimony or documentary evidence, and as a result, the Court is unable to compute the monetary value of the diminution in her annual earning capacity, assuming that any such diminution exists.  *See Shubbuck v. Conners*, 939 N.E.2d 137, 137 (N.Y. 2010) (noting that plaintiff was unable to establish with reasonable certainty loss of future wages as a result of an accident where he failed to "compare his pre- and post-accident income [and] compare his post-accident income with the income of similarly situated employees in [his] company").

E.  Pain and Suffering

Plaintiff also seeks compensation for pain and suffering, which "does not lend itself to neat mathematical calculation."  *Caprara v. Chrysler Corp.*, 417 N.E.2d 545, 551 (N.Y. 1981); *see also Reed v. City of New York*, 757 N.Y.S.2d 244, 248 (App. Div. 2003) ("[P]ersonal injury awards, especially those for pain and suffering, are subjective opinions which are formulated

---

additional credence.  The United States Department of Labor's Bureau of Labor Statistics reported that, as of May 2012, bartenders in New Jersey earned an annual mean wage of $24,660.  The annual mean wage for bartenders employed nationwide at "Restaurants and Other Eating Places" like Jessie's Country Kettle in Hewitt, New Jersey, where Plaintiff was working at the time of the accident, was $22,190.  *See* U.S. Dep't of Labor, Bureau of Labor Stat., Occupational Employment and Wages, May 2012: 35-3011 Bartenders, *available at* http://www.bls.gov/oes/current/oes353011.htm.

without the availability, or guidance, of precise mathematical quantification.").

"Under New York law, future pain and suffering damages are calculated, in part, through reference to actuarial tables to determine the projected life span of the plaintiff, and include all other tangible and intangible losses that were sure to follow." *Braccia*, 2011 WL 2848146, at *4 (internal quotation marks and brackets omitted); *see also Annexstein v. Inzerilli*, No. 10-CV-3655, 2012 WL 526647, at *8 (E.D.N.Y. Feb. 16, 2012) ("In determining the amount of future pain and suffering damages, the Court considered Plaintiff's projected life span through reference to actuarial tables as the Court is required to do given its finding that Plaintiff's injuries are permanent."), *adopted as modified by* 2012 WL 827007 (E.D.N.Y. Mar. 9, 2012). However, "[w]hile future pain and suffering depends on actuarial tables, past pain and suffering does not." *House*, 359 F. App'x at 209 (citing *Reed,* 757 N.Y.S.2d at 247–49). "New York courts have awarded past pain and suffering damages based on the medical procedures endured and nature of the injury suffered." *Id*. at 209–10 (collecting cases). Also, as to both future- and past-pain-and-suffering damages, "comparable approved awards from similar cases serve as guideposts for determining reasonable compensation under New York law . . . ." *Gottesman v. Ashdod*, No. 00-CV-5139, 2003 WL 21383819, at *2 (S.D.N.Y. June 11, 2003).

The Court begins by referencing actuarial tables to determine Plaintiff's projected life span. Plaintiff was born on September 5, 1983. (*See* Inquest Hr'g Tr. 13.) This means that Plaintiff was 13–14 years old in 1997, and 24–25 years old in 2008. The calculation of Plaintiff's age during these years is relevant because 1997 is the most recent year from which

18

New York's Civil Pattern Jury Instructions provide life expectancy calculations, while 2008 is

the most recent year from which the United States Department of Health and Human Services

National Vital Statistics Report calculates the same.[3]

In calculating and assessing the reasonableness of damages awards under New York law,

courts have relied on both sources of information.  *See, e.g.*, *House*, 359 F. App'x at 209 (relying

on National Vital Statistics Report)*; Annexstein*, 2012 WL 526647, at *8 (same); *Caruso v.*

*United States*, No. 01-CV-1207, 2002 WL 31870571, at *6 n.6 (N.D.N.Y. Dec. 23, 2002)

(relying on Pattern Jury Instructions); *Watts v. State*, No. 104748, 2004 WL 5643771, at *3

(N.Y. Ct. Cl. July 7, 2004) (same), *judgment entered sub nom.* 2004 WL 5272606 (N.Y. Ct. Cl.

Aug. 10, 2004).

According to the Pattern Jury Instructions, a 13–14-year-old girl in 1997 could be

expected to live for an additional 67 years, or to the age of 80–81.  *See* N.Y. Pattern Jury

Instructions–Civil div. 2, app. A (3d ed. 2013).  According to the National Vital Statistics

Report, a 25-year-old woman in 2008 could be expected to live for an additional 56.5 years, or to

the age of 81.5.[4]  *See* Elizabeth Arias, U.S. Dep't of Health & Human Servs., 61 Nat'l Vital Stat.

---

[3] As the New York Civil Pattern Jury Instructions explain:
"The source of this information is the National Center for Health Statistics, Vital
Statistics of the United States, Volume II, Mortality, Part A, Section 6, as published
in the National Vital Statistics Reports, Vol. 47, No. 28 (December 13, 1999).  While
a more recent set of tables exists, those tables are less complete than the tables in
Appendix A in that they only report life expectancy for individuals in five-year age
cohorts.  Since the differences between the 1999 and 2004 tables are minimal, the
1999 tables have been retained."
N.Y. Pattern Jury Instructions–Civil div. 2, app. A (3d ed. 2013) (citation omitted).

[4] Plaintiff submitted no definitive information as to her ethnicity at the Inquest Hearing.
While she is referred to as "white" in at least one medical report, it remains unclear whether for
the purposes of the National Vital Statistics Report she would be considered "White" or "non-

Rep., no. 3, tbl.B (Sept. 24, 2012), *available at*

http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_03.pdf.  Considering that Plaintiff submitted

the Pattern Jury Instructions actuarial table at the Inquest Hearing, and that the difference

between the life-expectancy results yielded by the two tables is so negligible that the Court's

analysis would not be substantively affected by the selection of one over the other, the Court will

rely upon Plaintiff's selection to find that she can be expected to live for another 50–51 years.

Plaintiff has argued in her Post-Inquest Memorandum that her injuries are "most

comparable to double arm amputations."  (Post-Inquest Mem. 5.)  Claiming that "double arm

amputation cases are unavailable in New York for comparison," Plaintiff cites two cases "where

a plaintiff has had one arm amputated as a result of another's negligence."  (*See id.*)  The Court

is unpersuaded that double- or single-arm-amputation cases provide the only analogous reference

points for a determination of Plaintiff's pain-and-suffering damages.  While Plaintiff

undoubtedly lost significant functionality in both of her arms, that loss has not been complete, as

would be the case if she were a double-amputee.  (*See* Inquest Hr'g Tr. 34–38.)  Instead, the

Court relies on New York cases in which a plaintiff's use of her arms has been substantially and

permanently, but not absolutely, compromised.

------

Hispanic White."  As a result, the Court relies on the "All races and origins" category in
reaching its determination.  Regardless, the differences in life expectancy at age 25 in 2008
between women belonging to the four listed races and origins are relatively minimal, ranging
between 53.3 and 59.1 years.  *See* Elizabeth Arias, U.S. Dep't of Health & Human Servs., 61
Nat'l Vital Stat. Rep., no. 3, tbl.B (Sept. 24, 2012), *available at*
http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_03.pdf.  Selection of one category over
another would not substantively alter the Court's decision to rely on the New York Pattern Jury
Instructions.

In *Nutley v. New York City Transit Authority*, 913 N.Y.S.2d 694 (App. Div. 2010), the defendant appealed from a jury verdict finding it at fault for an accident that caused a plaintiff to "suffer[] an injury to his dominant hand and wrist which required surgery.  Despite the surgery, the plaintiff continued to experience pain, numbness, tingling, loss of strength, and loss of motion in his wrist and hand."  *Id.* at 695.  The plaintiff's accident occurred when he "slipped and fell on a stairway."  *Nutley v. N.Y.C. Transit Auth.*, 2009 WL 2574364 (N.Y. Sup. Ct. Aug. 4, 2009).  The Appellate Division upheld a jury verdict of $300,000 for past pain and suffering. *Nutley*, 913 N.Y.S.2d at 695.  The plaintiff's accident occurred on October 8, 2005, and the jury entered its damages verdict on December 1, 2008, *Nutley,* 2009 WL 2574364, which means that the jury's damages award for past pain and suffering amounted to approximately $95,000 per year.

In *Yanez v. Kasenetz*, 705 N.Y.S.2d 588 (App. Div. 2000), the defendant appealed from a jury verdict awarding a plaintiff who "suffered injury to the radial, medial and ulnar nerves in his right arm" approximately $7,143 per year in future-pain-and-suffering damages.  *Id.* at 589.  The plaintiff "[had] suffered and [would] continue to suffer from pain and fatigue whenever he use[d] his right arm for a prolonged period of time," "[could] no longer lift heavy objects and often drop[ped] things from his right hand," and "[could] no longer enjoy many of the activities he engaged in prior to the accident."  *Id*.

In *Garrow v. Rosettie Associates, LLC*, 875 N.Y.S.2d 307 (App. Div. 2009), the defendant appealed from a jury verdict finding it at fault for an accident that caused a plaintiff to:

> "sustain[] hyperflexion of her dominant arm and injury to her brachial plexus. . . . [P]laintiff's continuing symptoms included pain, numbness, weakness and reduced range of motion in her right arm[, symptoms which were] permanent and [which] significantly limit[ed] her use of her right arm and shoulder. . . . [Plaintiff] described

21

how these symptoms restrict[ed] her activities, making it difficult or impossible to sleep, perform household chores, do gardening, lift heavier objects and use a computer."

*Id.* at 308–09.  The Appellate Division upheld a jury verdict of $450,000 for future pain and suffering.  *Id.*  At the time of the verdict, the plaintiff had a life expectancy of 44.7 years, *id.* at 309, which means that the jury's damages award for future pain and suffering amounted to approximately $10,067 per year.

*Keefe v. E & D Specialty Stands, Inc.*, 708 N.Y.S.2d 214 (App. Div. 2000), provides another useful point of reference.  There, the plaintiff suffered a laceration to his ulnar nerve. *See id.* at 214.  Despite three surgeries, plaintiff had a permanent loss of feeling and a permanent fifty-percent loss of strength in his dominant hand.  *See id.* at 215.  The Appellate Division upheld a jury award of $1,000,000 for future pain and suffering to cover the plaintiff's 40-year life expectancy, *id.*, which means that the jury's damages award for future pain and suffering amounted to $25,000 per year.

Other damages awards for comparable injuries upheld by New York appellate courts fall within the same general range as those in the cases described above.  *See, e.g.*, *Karwacki v. Astoria Med. Anesthesia Assocs., P.C.*, 808 N.Y.S.2d 123, 124 (App. Div. 2005) (upholding verdict of $600,000 for past and future pain and suffering for plaintiff who sustained "comminuted intra-articular distal radius fracture of his dominant right wrist," "underwent two operations, sustained permanent damages to his median nerve," "developed traumatic arthritis," and "continued to experience pain, weakness, and limited range of motion in his right hand," as well as "weakened grip strength and numbness in some of his right fingers," six years following his accident); *Fields v. City Univ. of N.Y.*, 628 N.Y.S.2d 76, 77 (App. Div. 1995) (upholding

22

verdict of $400,000 for past and future pain and suffering for 14-year-old female plaintiff after circular saw amputated one-third of her ring finger, decreased sensation in two of her other fingers, and caused her emotional and mental suffering, permanency of pain, loss of function, nerve damage, and unattractive deformity); *Van Deusen v. Norton Co.*, 612 N.Y.S.2d 464, 468 (App. Div. 1994) (upholding verdict of $15,000 per year for future pain and suffering for plaintiff who suffered "permanent injuries in his dominant arm, wrist and hand which is evidenced by atrophy, scarring, a loss of function, strength, diminished sensation and restriction of motion.").

Turning to the application of these cases as "guideposts" for the determination of the damages to which Plaintiff is entitled in this action, *Gottesman*, 2003 WL 21383819, at *2, the Court begins by considering the damages that Plaintiff should receive for past pain and suffering. The damages award for past pain and suffering of approximately $95,000 per year upheld in *Nutley* is a helpful starting point.  However, in *Nutley*, the plaintiff suffered injury to only one of his arms, whereas here, Ms. Norcia suffered permanent injuries to both of hers.  Additionally, although the injuries suffered by both plaintiffs are reasonably comparable, Ms. Norcia's were more severe.  Therefore, the Court awards Plaintiff damages for past pain and suffering in the amount of $200,000 per year, or a little more than double the amount per year that the plaintiff received in *Nutley*.  Plaintiff's accident occurred on June 30, 2007, (Compl. ¶¶ 79–80), or approximately 6.33 years ago, which means that Plaintiff is entitled to $1,266,000 in total damages for past pain and suffering.

Turning next to the damages for future pain and suffering, the Court finds that the permanent injuries the plaintiffs suffered in *Yanez*, *Garrow*, and *Keefe* are reasonably

comparable to the permanent injuries that Ms. Norcia will continue to suffer for the rest of her life, which she described at the Inquest Hearing.  Again, the one critical difference between those three cases and the instant action is that the plaintiffs in those cases suffered injuries to only one of their arms, whereas Ms. Norcia suffered injuries to both of hers.

As a result, in order to determine Plaintiff's future-pain-and-suffering damages, the Court takes the average of the damages awards in *Yanez*, *Garrow*, and *Keefe*, which is approximately $14,070 per year, and multiplies that figure by two, which yields the amount of $28,140 per year.  Multiplying that amount by Plaintiff's life expectancy of 51 years results in a total damages award for future pain and suffering of $1,435,140.[5]

### F.  Punitive Damages

Plaintiff claims that Defendants' actions in continuing to serve Dieber, Jr. alcohol while he was visibly intoxicated and then permitting him to operate a boating vessel while intoxicated was willful, wanton, and reckless, and resulted in serious and permanent injuries to the plaintiff. As a result, Plaintiff claims entitlement to punitive damages in the sum of $20,000,000.  (Inquest Mem. ¶ 35.)

"The potential for a dram shop keeper to be held liable for actual and punitive damages based on a violation of General Obligations Law § 11–101 is intended to have a deterrent effect."  *Rutledge*, 613 N.Y.S.2d at 180.  However, and "[s]ignificantly, it has been held that punitive damages are not appropriate in every instance of a Dram Shop Act violation." *Anderson v. Comardo*, 436 N.Y.S.2d 669, 674 (Sup. Ct. 1981) (citing *Reid v. Terwilliger*, 22

---

[5] Eternally optimistic, the Court chooses to rely upon the upper limit of Plaintiff's 50–51 year life expectancy range in calculating her future-pain-and-suffering damages.

N.E. 1091 (N.Y. 1889), *superseded by statute*, N.Y. Gen. Oblig. Law § 11-101, *as recognized in D'Amico v. Christie*, 518 N.E.2d 896, 898 (N.Y. 1987)).  Rather, punitive or exemplary damages are appropriate only where the conduct of the defendants in violation of the statute was willful, wanton, reckless, and intentional.  *See Estate of Ratcliffe v. Pradera Realty Co.*, No. 05-CV-10272, 2007 WL 3084977, at *6 (S.D.N.Y. Oct. 19, 2007) ("Under New York's Dram Shop Act, which expressly provides for the right to recover exemplary damages, a plaintiff's allegations that the defendant acted in a 'wanton, willful, and reckless' manner are sufficient to state a claim for exemplary damages.") (citation omitted); *McCauley v. Carmel Lanes Inc.*, 577 N.Y.S.2d 546, 548 (App. Div. 1991) ("General Obligations Law § 11-101(1) expressly provides for the right to recover exemplary damages and plaintiff's allegations of defendant's 'wanton, willful and reckless' conduct are sufficient to allow such a claim at this juncture.").  To meet the "wanton, willful and reckless" standard, a plaintiff must show that the defendants' acts "demonstrate[d] conscious indifference and disregard of the effect upon the health, safety, and rights of others." *Samela v. Post Rd. Entm't Corp.*, 954 N.Y.S.2d 603, 606 (App. Div. 2012).

Plaintiff did not provide sufficient evidence at the Inquest Hearing to warrant a finding that Defendants' conduct met this standard.  Plaintiff testified that during the summer on Greenwood Lake, she would observe wait staff at Dieber's Castle serving visibly intoxicated persons up to 100 times.  (*See* Inquest Hr'g Tr. 43–44 ("If it was in the summer, I saw it . . . .  I mean, you could see it all the time.  There [were] always fights there and . . . people getting wasted.  I mean, how many times I was there and [Dieber, Jr.] was there with his family and . . . everyone's drunk and doing shots and then jumping on the boats . . . .").)  But, Plaintiff did not testify that she observed wait staff at Dieber's Castle or any other establishment named as a

defendant in this action serving a visibly intoxicated Dieber, Jr. on July 29–30, 2007, the night of

the accident.  (*See* Inquest Hr'g Tr. 47 ("THE COURT: The Kettle is where he started, but you

saw him at the Castle later?  THE WITNESS: No.  They went to the Castle.  Like they left the

Kettle . . . .  THE COURT: And did you see them physically at the Castle?  THE WITNESS: No,

I didn't.").)  To the extent that Plaintiff testified that Dieber, Jr. and others he was with reported

that they were drinking at such establishments, that testimony was inadmissible hearsay upon

which the Court may not rely in reaching its damages determination.  (*See* Inquest Hr'g Tr.

47–48 ("THE COURT: They just reported that they went?  THE WITNESS: Yeah.  You know,

when I was speaking to them finding out where they were, they were at the Castle at the time.").)

 *See also Braccia*, 2011 WL 2848146, at *3 ("[I]n an inquest on damages following a default,

damages must be based on admissible evidence."); Fed. R. Evid. 802 (hearsay generally

inadmissible).[6]  Therefore, the Court is unable to determine whether the conduct upon which

Defendants' liability is predicated was "willful, wanton, reckless and intentional," as would be

required for a finding that Plaintiff is entitled to punitive damages.[7]

---

[6] The hearsay exception for admissions by party opponents codified in Federal Rule of
Evidence 801(d)(2) is inapplicable here, as this is an action against the owners and operators of
the bars that served Dieber, Jr. alcohol in the hours leading up to the accident, not against
Dieber, Jr. himself.  *See* Fed. R. Evid. 801(d)(2).

[7] Further, even if Plaintiff's evidence had established that Defendants' conduct met the
standard for punitive damages, it still would not have established her entitlement to the excessive
amount of punitive damages that she claims.  In Plaintiff's Post-Inquest Memorandum, she cites
three jury-verdict summaries for the proposition that, "where restaurant/bar establishments were
found liable under dram shop laws, punitive damages were awarded."  (Post-Inquest Mem. 4
(citing *James Barnes v. Dixie NYC Inc.*, 24 N.Y. Jury Verdict Rev. & Analysis 9:C6 (N.Y. Sup.
Ct. Aug. 8, 2007), *available at* 2007 WL 7952732; *Riviezzo v. Annis & Birar Patch Bar*, 10 N.Y.
Jury Verdict Rev. & Analysis 5:C6 (N.Y. Sup. Ct. Feb. 1, 1993), *available at* 1993 WL
13734298; *Contini v. Yurko; Lanes d/b/a The Briar Patch*, Jury Verdict Res., No. 45656 (N.Y.
Sup. Ct. June 1988), *available at* 1988 WL 369961).)  Plaintiff claims that these cases are
"similar" to the present action.  (Post-Inquest Mem. 4.)  And yet, Plaintiff seeks $20,000,000 in

G.  Costs and Disbursements

Plaintiff seeks recovery for the costs and disbursements associated with this Action. While "[a] party in whose favor a judgment is entered is entitled to costs in the action," N.Y. C.P.L.R. § 8101, and "[a] party to whom costs are awarded in an action . . . is [also] entitled to tax [her] disbursements,"  N.Y. C.P.L.R. § 8301, Plaintiff has provided the Court with no evidence as to the costs or disbursements to which Plaintiff is supposedly entitled.  Plaintiff merely alleges in conclusory fashion that she is entitled to $978.58 on these grounds.  (*See* Inquest Mem. ¶ 39.)  As a result, the Court is able to award Plaintiff only $350 in costs, for this Action's filing fee, a record of which exists on the docket.  (*See* Dkt. No. 1 ("Filing fee $ 350.00, Receipt Number 907461.").)

---

punitive damages, an amount more than 57-times greater than the largest punitive-damages award in any of the three cases to which she cites.

### III.  Conclusion

For the reasons discussed herein, Plaintiff is awarded $300,331.12 in medical expenses; $30,000 in past lost earnings; $1,266,000 in past pain and suffering; $1,435,140 in future pain and suffering; and $350 in costs.  In total, Plaintiff is awarded $3,031,821.12.  The Clerk of Court is respectfully directed to enter judgment for Plaintiff in the amount of $3,031,821.12 and to close the case.

SO ORDERED.

Dated:      October 29, 2013
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

28